IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 12074

GLENN H. ALLMAN, Administrator
of the Estate of Ivan B. Allman,
Deceased,

Plaintiff and Appellant,

vs.

J. M. STUART, the CITY OF GLASGOW
and the COUNTY OF VALLEY,

Defendants and Cross Plaintiffs.

FILED

FEB 1 - 1972

*Thomas J. Kearney*

CLERK OF SUPREME COURT
STATE OF MONTANA

ORDER

PER CURIAM:

The opinion of this Court dated January 10, 1972 is ordered amended as follows:

Another paragraph shall be added on page 12, at the end of the present opinion and reading:

"Plaintiff-appellant to have his costs on this appeal, to be taxed by the district court."

The petition for rehearing is denied.

DATED this 1st day of February, 1972.

No. 12074

IN THE SUPREME COURT OF THE STATE OF MONTANA

1971

---

GLENN H. ALLMAN, Administrator of the
Estate of IVAN B. ALLMAN, Deceased,

Plaintiff and Appellant,

-vs-

J. M. STUART, the CITY OF GLASGOW,
and the COUNTY OF VALLEY,

Defendants and Cross-Plaintiffs.

---

Appeal from: District Court of the Seventeenth Judicial District,
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

Leo J. Kottas, Sr. argued, Helena, Montana.

For Defendants:

Robert Hurly argued, Glasgow, Montana.

---

Submitted: December 2, 1971

Decided: JAN 10 1972

Filed: JAN 10 1972

*Thomas J. Kearney*
                                              Clerk

Mr. Justice Frank I. Haswell delivered the Opinion of the Court.

In a suit between plaintiff who owns two lots and defendant who owns an office building situate thereon, the district court of Valley County entered judgment requiring sale of the lots and building as an entity, with apportionment of the sale proceeds between the parties. Plaintiff appeals from this judgment and denial of his motion for a new trial.

The salient facts here are unique. The two lots in question are located in the City of Glasgow, Montana. An office building had been constructed on the lots by persons other than the parties in the instant case. Financial problems ensued culminating in a mortgage foreclosure action filed in the United States District Court in Glasgow by plaintiff's decedent, who was the owner and holder of two $10,000 promissory notes and mortgages. Several lienholders, including defendant here, were named as parties defendant in the foreclosure action.

On June 19, 1961, the United States District Court entered its foreclosure decree requiring a separate sale at public auction of the lots on the one hand and a separate sale of the building on the other hand. Presumably this was done to establish the proper lien rights and priorities among the various lienholders, as to the land and building respectively. Pursuant to this foreclosure decree, the sale was held by the United States Marshal on October 10, 1961, in Glasgow.

The office building was offered for sale first. Plaintiff's decedent, who was the mortgage holder, and defendant, who held a mechanic's lien for electrical equipment installed in the

- 2 -

building, each bid on the building. Defendant eventually was the successful bidder at a price of $14,000.

The two lots were then offered for sale and purchased by plaintiff's decedent for a price of $20,000. Defendant testified that he intended to bid on the lots, but did not do so because the opening bid was too high.

Both sales were subsequently confirmed by the United States District Court and separate certificates of sale were issued to the respective purchasers. No appeal has ever been taken by anyone in the foreclosure proceedings.

Following the foreclosure sale, negotiations were had between the respective owners of the lots on the one hand, and of the building on the other. Defendant's testimony summarizes the situation:

> "Q. And during the first year or two after this Marshall (sic) sale was made you [defendant] and myself [defendant's attorney] and Mr. Kottas [plaintiff's attorney] and Mr. Allman [plaintiff] have negotiated together may times trying to work out a solution to this problem of divided ownership haven't we? (Bracketed material supplied)
>
> "A. That is correct."

During this period the condition of the building differed materially from its condition at the time of trial. The following excerpt from defendant's testimony portrays this situation:

> "Q. And during that first period also isn't it true that your building was in not too good shape and it wouldn't have been too hard to move?
>
> "A. The walls were cracked and it was only about a third rented and the paint and everything from settlement and stuff...the walls were cracked and it could have been moved without doing too much damage outside of maybe losing the masonry on the outside of it which at the time cost around $3,100.00 something like that, to replace the masonry.

"Q. And actually over the years since you bought the building you've put in approximately $12,000.00 worth of improvements have you not?

"A. Yes. The building is real good shape and fully rented at the present.

"Q. And these improvements in these cases were required by your renters in order to rent space to them?

"A. Well it couldn't be rented without doing it, no.

"Q. And isn't it also true that about $1,000.00 of those improvements have been to grade and gravel the land around the building?

"A. Yes the water...it stood around there like a lake and you...besides not being able to park the seepage underneath was what was making it settle and cracked all the walls.

"Q. Is it practical to move the building at the present time?

"A. Well it isn't practical. It would, it could be moved but its costs would be pretty prohibitive. It would undo all the remodeling and it would be a real expensive proposition.

"Q. And this has been attached to the ground with a permanent concrete foundation, has it not?

"A. That is correct.

"Q. And there are water and sewer and gas lines that go underground to the building?

"A. Uh huh.

"Q. And it has sidewalks and steps that are attached to the ground?

"A. I put in new sidewalks on the south side towards the Elks this summer. There was running water settled way down and was running water under the footing so---

"Q. Approximately how much money do you have invested in the building at the present time?

"A. Around $22,000.00."

The negotiations between plaintiff and defendant concerning the building problem continued through at least 1965, according to defendant. As early as 1963 defendant was notified by plaintiff, in writing, to move the building off the lots; defendant was

- 4 -

notified in writing again in 1964. Oral notification was also made in 1965. Plaintiff's testimony concerning this notice is summarized in the following excerpt:

"Q. Do you recall having a conversation with Mr. Stuart at his home, you and I, after talking to Mr. Hurly [defendant's attorney], and Mr. Hurly told us that we could go and talk to Mr. Stuart? Do you recall the year that was? (Bracketed material added)

"A. I think it would have been in 65.

"Q. And did we contact Mr. Stuart at that time?

"A. Yes.

"Q. And where did we contact him?

"A. At his house.

"Q. Who was present?

"A. You and Mr. Stuart and myself.

"Q. And what... Did you talk to him about anything at that time?

"A. Yes.

"Q. What was it?

"A. About removing the building.

"Q. And what, what was the gist of the conversation that you had in my presence there with Mr. Stuart?

"A. Well he was going to get around to it and we talked about if we shouldn't be getting some rent off for the time that he had used it, and he agreed that we should and I think, I think he asked how much we wanted and I told him to submit a figure and I'd take it up with the heirs and ...

"Q. Did you receive such a figure from him?

"A. No."

State and local taxes were separately billed to the owner of the lots and to the owner of the building respectively, following the recording of the foreclosure decree.

Defendant has paid nothing to plaintiff for the use of the land on which the building is situated, nor has he made an accounting of income from the building.

On January 11, 1966, plaintiff filed the instant suit against defendant in the district court of Valley County seeking a mandatory injunction requiring defendant to remove his building from plaintiff's two lots, an accounting of rents and profits from the building, damages, and attorney fees.

Defendant answered and filed a counterclaim, mistakenly designated a cross complaint. His answer admitted the purchase of the the land by plaintiff and the purchase of the building located thereon by himself; his collection of all rentals for space in the building; generally denied all else including any right in plaintiff to relief; and set forth two affirmative defenses: (1) The rentals collected are for space in the building and are no concern of plaintiff; (2) The entire situation was created by plaintiff's decedent in causing the land and building to be sold separately in his foreclosure action.

On September 11, 1967, Judge Loucks sustained plaintiff's motion to dismiss defendant's answer and counterclaim (erroneously designated a cross claim). Subsequently Judge Loucks died and Judge Sorte, his successor, assumed jurisdiction. Plaintiff filed an amended complaint naming the city of Glasgow and Valley County as additional parties defendant, so that tax liability on the lots could be determined. Defendant Stuart filed an answer and counterclaim to the amended complaint substantially similar to his original pleading.

Trial was held before the court sitting without a jury. On March 11, 1971, the district court entered its findings of fact,

- 6 -

conclusions of law and judgment. Its substance was:

> "The only equitable solution to this controversy is to sell the lot and building together and thereafter apportion the proceeds among the parties".

Judgment was entered accordingly.

Following the district court's denial of plaintiff's motion to amend the findings of fact, conclusions of law, and judgment or in the alternative to grant plaintiff a new trial, plaintiff appeals from the final judgment and denial of his motion for new trial.

Plaintiff lists six issues for review upon appeal. We summarize the controlling issues in this fashion:

1. Is plaintiff entitled to a mandatory injunction requiring removal of the building from his lots?

2. Is defendant entitled to require that the land and building be sold together and the proceeds apportioned among the parties?

3. Is plaintiff entitled to an accounting or reasonable rental for the use of his land?

The first issue for review requires no extended discussion. Plaintiff is the sole and exclusive owner of the two lots by virtue of his purchase of the land at the foreclosure sale. Defendant acquired no interest in the land by virtue of his purchase of the building thereon, under the separate foreclosure sale of the building. Defendant testified that at the time of the foreclosure sale he knew he was buying just the building; that plaintiff's decedent bought the land; and that water, sewer, and electrical connections were in place. Defendant admitted negotiations were had following their respective purchases at the

foreclosure sales in an attempt to work out a solution to the problem of divided ownership. The evidence is equally clear that despite their failure to resolve this question, defendant went ahead and made extensive improvements to the building to the tune of some $12,000, which rendered it impractical to remove the building from plaintiff's land.

There is no evidence plaintiff misled defendant into taking this course of action or had anything to do with it; on the contrary, all the evidence indicates repeated demands by plaintiff that defendant remove the building from plaintiff's lots. It is admitted by both parties that defendant has paid nothing to plaintiff for the use of his land occupied by defendant's building for several years following the foreclosure sales. Plaintiff has repeatedly demanded that defendant remove the building; defendant has neglected to do so without any right whatever to occupy plaintiff's land; and, plaintiff is entitled to a mandatory injunction requiring defendant to remove the building from plaintiff's land within such reasonable time and under such reasonable procedures as the district court may require.

Directing our attention to the second issue for review, the rights of the parties are equally clear. The district court cannot order that the lots and building be sold as an indivisible entity with the proceeds of the sale apportioned between the parties in the absence of a primary right in defendant to such relief. Here, there is no such primary right in defendant either under Montana's partition statutes or by application of any recognized equity principle.

Defendant has no right to such relief under our partition statutes as they require an individed co-ownership of the property

to be partitioned. Section 93-6301, R.C.M. 1947, provides in material part:

> "When several cotenants hold and are in possession of real property as joint tenants or tenants in common * * * an action may be brought by one or more of such persons for a partition thereof * * * and for a sale of such property, or a part thereof, if it appears that a partition cannot be made without a great prejudice to the owners."

Section 93-6301.1, R.C.M. 1947, requires the same co-tenancy in partition actions of personal property. Here, there is no cotenancy of an undivided interest as joint tenants, tenants in common, or otherwise; on the contrary, plaintiff/the sole and exclusive owner of the real estate, i.e. the land, while defendant is the sole and exclusive owner of the personal property, i.e. the building. Accordingly, defendant has no standing to bring a partition action on the entire property, i.e. the land and the building, as he is not a cotenant therein. In effect, the foreclosure decree and separate sales partitioned the property into two separate parts, each owned exclusively by the respective parties to this action.

Nor has defendant, under any recognized equitable principle, established any primary right in himself to have the building and land merged for sale, sold as an entity, and the sale proceeds apportioned between the respective owners. Both parties purchased their respective properties with their eyes open; under no mis-representation, mistake, or misunderstanding; and, with full knowledge of the problems inherent in divided ownership.

Defendant unilaterally proceeded to expend a substantial sum of money in improvements on his building, rendering it im-practical to remove it from plaintiff's land. All these improve-ments were made without any agreement or payment to plaintiff of a reasonable rental for the use of his land, and at least some of

the improvements were made in the face of repeated demands by plaintiff that defendant remove his building from plaintiff's land. Defendant is nothing more than a naked trespasser on plaintiff's land who proceeded at his peril with substantial improvements to his building in the hope that some agreement could be reached whereby he could purchase the land, plaintiff would purchase his building, or a rental agreement or some other arrangement could be consummated so that the building would not have to be removed from the land. No agreement has been reached and now defendant seeks to compel plaintiff to sell his land at public auction.

Defendant has no primary right to compel plaintiff to do this. The land belongs to plaintiff who has the right to sell it on such terms and conditions as he sees fit; or plaintiff can refuse to sell it at all. These rights are unquestioned incidents of legal ownership of private property. Plaintiff's motives or reasons for sale or refusal to sell, or his terms and conditions of sale, are immaterial.

Unquestionably defendant now finds himself in a difficult position with a likelihood of sustaining a substantial loss, but it is a situation of his own making for which plaintiff is in no way chargeable nor responsible. Although defendant argues that this situation was created by plaintiff's decedent in bringing about the divided ownership as a result of his foreclosure suit, there is neither evidence that the separate sales under the foreclosure decree were his doing, nor that defendant misunderstood or was misled in any way about what he was purchasing or of his rights thereunder.

Under such circumstances, what equitable principle compels the owner of land to sell it at public auction against his wishes to prevent a loss to a continuing trespasser with notice? The question provides its own answer and demonstrates the fallacy of defendant's position on this issue.

Proceeding to the final issue, we hold that although plaintiff is not entitled to an accounting of defendant's rentals on his office building, plaintiff is nevertheless entitled to a reasonable rental for the use of his land occupied by defendant's building. Plaintiff is not entitled to an accounting simply because defendant is the sole and exclusive owner and landlord of the building and plaintiff has no interest in the building or rentals derived from its tenants. On the other hand, plaintiff as sole and exclusive owner of the land on which the building is situate is entitled to the reasonable rental value of his land for the period of time it was and is occupied by defendant's building.

The record of the trial is devoid of any substantial credible evidence concerning the reasonable rental value of plaintiff's land. The only evidence offered on this point is the bald assertion by plaintiff that "we figured it could easily bring in $75.00 to $80.00 a month" just for parking. Plaintiff gave no basis for this opinion and admitted that he did not look into the actual expense of creating a parking lot on his land. Plaintiff also testified there were two vacant lots immediately west of his land which were used as parking space for patrons of the Elks Club and defendant's building and that he did not know of anyone who was paying any sort of rent for this parking.

Accordingly, this cause is remanded to the district court with directions to vacate the findings of fact, conclusions of law, and judgment heretofore entered; to hold a further hearing to determine the reasonable rental value to be paid plaintiff for the use of his land by defendant; and, for the entry of appropriate findings of fact, conclusions of law, and final judgment in conformity with this opinion.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Associate Justices.

- 12 -